# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## BRYSON CITY DIVISION
## CIVIL CASE NO. 2:14-cv-00006-MR-DLH

JAMES D. DAVIS, )
)
             **Plaintiff,** )
)
    **vs.** )       **MEMORANDUM OF**
)    **DECISION AND ORDER**
**WESTERN CAROLINA UNIVERSITY** )
**and THE UNIVERSITY OF NORTH** )
**CAROLINA,** )
)
           **Defendants.** )
_____ )

    **THIS MATTER** is before the Court on the Defendants' Motion for Summary Judgment [Doc. 33] and on the Plaintiff's Motion for Partial Summary Judgment. [Doc. 35]. The parties have responded to each other [Docs. 40, 41, 42, and 43] and the matter is thus ripe for the Court's review.

## PROCEDURAL HISTORY

    Plaintiff James D. Davis ("Plaintiff" or "Davis") filed his Complaint commencing this action on February 19, 2014. [Doc. 1]. Thereafter, Davis filed his Amended Complaint on May 5, 2014. [Doc. 10]. The Amended Complaint asserts five causes of action under the Americans with Disabilities

Act ("ADA")[1] and Section 504 of the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act ("the Rehabilitation Act").[2]  Specifically, Davis contends that the Defendants Western Carolina University ("WCU") and The University of North Carolina ("UNC") (collectively "Defendants")[3] violated the ADA and the Rehabilitation Act by: (1) denying him tenure and promotion; (2) terminating his employment; (3) failing to accommodate his disability; (4) segregating him; and (5) retaliating against him.  [Id. at 13-15].  As set forth in the responses contained in their Answer, Defendants deny they violated the ADA and the Rehabilitation Act with regard to Plaintiff's employment.  [Doc. 15 at 18-19].

On April 1, 2015, Defendants filed their Motion for Summary Judgment.  [Doc. 33].  That same day, Davis filed a Motion for Partial Summary Judgment seeking a favorable judgment as a matter of law as to only his first and his second causes of action.  [Doc. 35].

---

[1] Pub. L. 101-336, § 2, 104 Stat. 328 (July 26, 1990), as amended by, Pub. L. 110-325, § 3, 122 Stat. 3554 (Sept. 25, 2008), codified at, 42 U.S.C. § 12101 et seq.

[2] Pub. L. 93-112, Title V, § 504, 87 Stat. 394 (Sept. 26, 1973), codified at, 29 U.S.C. § 794.

[3] Plaintiff has alleged, and Defendants admit, that Western Carolina University is a constituent institution of higher education of the University of North Carolina [Doc. 1 at ¶ 8; Doc. 8 at ¶ 8].  As such, both are properly named as defendants in this action.

# BACKGROUND

The parties have submitted literally thousands of pages of evidence in conjunction with their summary judgment motions and their responses thereto. This evidence consists largely of numerous deposition transcripts, hearing transcripts, correspondence, reports, and other documents. There is virtually no dispute between the parties as to the salient facts. The following is a summary of the facts that are undisputed. Reference to any disputed facts will be so noted.

WCU hired Davis in August of 2005 as a Visiting Assistant Professor in the Department of Modern Foreign Languages for the fall semester of that year. [Id. at 2]. WCU promoted Davis to Assistant Professor, which is a tenure track position, beginning January 1, 2006. [Docs. 10 at 2; 15 at 2]. Plaintiff holds a doctorate in Romance Languages from the University of Georgia. [Doc. 10 at 2]. Near the time Davis joined the faculty at WCU, he became a police officer with the East Ellijay Police Department in Georgia. [Id.].

While teaching at WCU, Davis was a recipient of the Chancellor's Meritorious Award for Engaged Teaching and the Paul A. Reid Distinguished Service Award. Further, Davis was a finalist for the 2010-11 Arts and Sciences Teaching Award and was nominated for the Board of Governors'

award for excellence in public service. Finally, a proposal submitted by Davis and Student Affairs professionals was selected for an Integration of Learning Award. [Doc. 15 at 3]. During Davis' employment with WCU, however, he was involved in numerous extra-curricular events reflecting less than ideal collegiality with faculty members, staff, and others that are more fully recounted below.

On September 26, 2006, WCU law enforcement officers filed a police report against Davis because he confronted and made derogatory comments to construction workers on WCU's campus when the workers called the police in an effort to tow Davis' improperly parked vehicle. [Doc. 33-7]. Davis had moved a barrel and parked in a space the workers had cordoned off to allow for paving equipment. When Davis returned to the parking lot to see his vehicle attached to the tow truck, he told the workers "they were just construction workers, not qualified to do anything else[,]" and said to the tow truck owner that "he [Davis] was better than them." [Id.]. Davis was cited for not having a valid WCU parking permit for his vehicle. [Id.]. The officer on the scene, Lieutenant Kent Davis (no relation to the Plaintiff) of the WCU Police Department, recommended that his report of the incident be forwarded to Plaintiff's Dean and Provost "for the correct disciplinary action."

[Id.].  Plaintiff later called Lt. Davis and told the officer he regretted his comments.  [Id.].

Later in the fall of 2006, Davis falsely told WCU faculty member Dr. Mark Couture that he had been diagnosed with a potentially life-threatening disease "to conjure sympathy."  [Doc. 33-63 at 2].  Davis later admitted, however, that he was not diagnosed with HIV until four years later in November, 2010.  [Doc. 33-62 at 46].  Dr. Couture testified that such behavior would later call into question Davis' honesty and would have a bearing on the issue of his "collegiality."  [Doc. 33-63 at 2 to 3].

Sometime in or around the summer of 2009, Davis involved himself in a private dispute between WCU faculty member Dr. Brent Kinser and Kinser's neighbor.  That summer, according to Kinser,

> my neighbor shot my wife's dog. Upon learning of this incident, Plaintiff, Dr. Jamie Davis, without my urging, knowledge or consent, contacted the workplace of our neighbor's wife to complain about the incident. Thinking that I was responsible for this intrusion into his wife's workplace, my neighbor met with my direct supervisor. Dr. Brian Gastle, then Department Head of the English Department, to request that some sort of ethics charge be filed against me.

[Doc. 33-57 at 2].  Kinser considered Davis' conduct in this regard to be "professionally disruptive."  [Id.].

After teaching on the morning of October 23, 2009, Plaintiff testified that he returned to his office on campus and ingested an excessive number

of Vicoprophen and Xanax pills. [Doc. 33-62 at 21 to 9]. WCU faculty member Dr. Lori Oxford found Davis in his office where Davis told her he had purposefully overdosed on prescription medication, having taken fifteen Xanax pills. According to Oxford, Davis exhibited to her slurred speech and slow movements. [Doc. 33-64 at 4 to 5; Doc. 33-8]. Dr. Oxford testified that, as soon as Davis heard the siren of an approaching ambulance, "he immediately ran out, got in his truck, and drove off very quickly." [Doc. 33-64 at 5]. Dr. Oxford was not convinced that Davis was entirely honest with her because, "[i]f he were genuinely under the influence of that much medication – I think he was exaggerating a bit." [Id.]. Dr. Santiago García-Castañón, the Head of the Modern Foreign Languages Department and Davis' supervisor, documented that Davis told him this incident was not intentional but "was triggered by a bad reaction caused by prescription drugs" [Doc. 33-10], and that he was otherwise "okay." [Doc. 33-65 at 9].

For his part, Davis gave conflicting accounts of his condition upon leaving his office October 23, 2009. He testified first that he was not sober enough to drive. [Doc. 33-62 at 16]. Shortly thereafter, Davis testified that when he left campus he did not know the extent to which the medication had taken effect but, "[a]t a later juncture, I was definitely not sober enough to be driving." [Id. at 17]. Davis ultimately drove from his office on WCU's campus

6

to his house in Georgia two hours away.  [Id. at 18]. When Davis arrived at his Georgia home, he began drinking. [Doc. 33-62 at 19]. Deputy Knight with the Gilmer County, Georgia, Sheriff's department confronted Davis at his home. [Id.].   Davis agreed to go to the North Georgia Medical Center.  [Doc. 38-19 at 13].   According to Davis, the doctor on call signed a 24-hour involuntary commitment order when Davis arrived and Davis thereafter went to sleep. [Id. at 14].   Later, when Davis was awoken by Gilmer County deputies, he tried to flee the hospital. [Doc. 33-9 at 2].  While being restrained from his efforts to leave, Davis attempted to bite Sergeant Patterson of the Gilmer County Sheriff's department because he was "trying to infect [him] with [a potentially life-threatening disease]."  [Id.].   Davis was then arrested on obstruction charges.  [Doc. 38-19 at 14].

The week after Plaintiff's overdose on campus, he met with WCU's Employee Response Team ("ERT"). The university's ERT personnel are charged with implementing WCU Policy 63 which seeks "to promote civility and mutual respect and to prohibit violence in the university community."[4] [Doc. 38-22 at 2]. According to Davis, the ERT meeting included WCU Director of Human Resources Kathy Wong, WCU Counseling and

_____

[4] One component of University Policy 63 is that the ERT oversee a "procedure for facilitating critical incident stress debriefings for employees and students who have been affected by an event related to trauma and victimization."  [Doc. 38-22 at 3].

Psychological Services Assistant Director Dr. Michelle Cooper, and WCU Police Chief Tom Johnson. [Doc. 33-62 at 20]. According to Wong, Davis "talked about personal issues that had been in his life, and he had had a reaction to a medication. And at the time that we met him, he said that he was fine[.]" [Doc. 38-21 at 8]. Davis could not remember if he had told the ERT personnel whether he had ever been diagnosed with depression or with panic attack disorder. Davis testified, however, that he did not mention ever having been diagnosed with post-traumatic stress disorder. Davis never requested from the ERT any accommodation for any of those three conditions. [Doc. 33-62 at 22]. Nevertheless, Dr. Cooper provided Davis with various counseling resources [Doc. 33-11 at 5 to 10], which Davis indicated he would pursue. [Id. at 1].

Two months later in December, 2009, Davis and his boyfriend of ten months broke up. [Doc. 33-62 at 25]. The evening of the break-up, Davis took one of his firearms from his night stand into the kitchen and contemplated suicide. [Id. at 26]. News of Davis' conduct was recounted to WCU faculty member Dr. Seán O'Connell by Davis' ex-boyfriend who was Dr. O'Connell's tenant at the time. [Id. at 27-28]. Dr. O'Connell in turn related the incident to Dr. García-Castañón. [Doc. 33-10]. Davis admitted that his behavior was disturbing to those involved. [Doc. 33-62 at 28].

Also in December, 2009, Davis informed Dr. García-Castañón he was resigning from all of his WCU committees. [Doc. 38-19 at 15]. While Davis acknowledged that his participation on WCU committees was an essential job function for his employment [id.], he chose to resign from them "for personal reasons." [Doc. 38-26 at 2]. In February of 2010, Dr. García-Castañón met with Davis to inform him that he had to rejoin some of the committees and that WCU's College of Arts and Sciences Dean, Wendy Ford, had said Davis' withdrawal from the committees was unacceptable. [Doc. 38-19 at 16]. Davis told García-Castañón he needed "a break, having had mental health issues, including a suicide attempt[,] … that if the Dean wants to pursue this matter further he will sue the university." [Doc. 38-27 at 2]. Davis did not request any accommodations, such as working from home or participating by email, in order to continue to be involved on the committees. [Doc. 38-19 at 15]. Davis re-established his committee work some eight to nine months later in the fall of 2010. [Id. at 16].

Plaintiff submitted his first tenure and promotion dossier in the early fall of 2010. Tenure and promotion review is a multi-step process. [Doc. 38-13]. An applicant's dossier is first reviewed by a committee of individuals in the applicant's department who make a recommendation as to tenure and promotion. [Id. at 19]. The Department Head then makes his or her own

recommendation. [Id. at 20]. The recommendation of the Department Committee and the Department Head is then presented to a committee of faculty from the appropriate College, in this case the College of Arts and Sciences (the "College Collegial Review Committee"). [Id. at 19]. This committee works with the appropriate College Dean to ensure proper departmental procedures were observed in the decisional process and then forwards its conclusions to the University Collegial Review Committee, a committee made up of faculty from the University as a whole. [Id.]. Next, the Dean makes a recommendation to the Provost concerning the applicant's request for tenure and promotion. [Id. at 20]. The University Collegial Review Committee then submits to the Provost its conclusions regarding whether departmental and collegial standards were followed in evaluating the applicant's dossier. [Id. at 19]. The Provost reviews the Dean's recommendation and the University Collegial Review Committee's conclusions and then passes her or his independent recommendation on to the Chancellor. [Id. at 20]. The Chancellor "[p]resents recommendations to the Board of Trustees for tenure and promotion." [Id. at 21]. The Board of Trustees makes the final approval of promotions and the granting of tenure under the delegation of the President and the Board of Governors. [Id.].

If an applicant receives an unfavorable tenure or promotion recommendation at the Provost level, the Faculty Handbook provides for an alternative path of review. If the Provost's recommendation includes a denial of tenure or promotion, the applicant may request that the Provost reconsider her/his previous recommendation. [Doc. 38-13 at 20]. The Provost, in accordance with certain directives, then has twenty days to notify the Chancellor of the results of the reconsideration process. [Id.]. If the Provost's decision upon reconsideration is a recommendation to deny tenure, and if the Chancellor's recommendation is to deny tenure as well, the applicant may seek a hearing before the Faculty Hearing Committee ("FHC"). [Id. at 45].

A hearing before the FHC is the phase of the process most analogous to a civil trial as it relates to live testimony and the presentation of evidence. [Id. at 45 to 48]. Following a decision by the FHC, the Chancellor is responsible for determining whether the evidence in the record supports the FHC's disposition of the matter. While the FHC's decision is entitled to deference, the Chancellor must thoroughly review the record evidence from the hearing and the written statement of the FHC. [Id. at 47]. If the Chancellor concurs in a recommendation of the FHC that is favorable to the applicant, the Chancellor's decision is final. If the Chancellor either declines

to accept a FHC recommendation that is favorable to the applicant or concurs in a FHC recommendation that is unfavorable to the applicant, the applicant may appeal to the Board of Governors. The applicant's notice of appeal must contain a brief statement of the basis for the appeal. The purpose of an appeal to the Board of Governors is to assure: (1) that the campus-based process for reviewing the decision was not materially flawed so as to raise questions about whether the applicant's contentions were fairly and reliably considered, (2) that the result reached by the Chancellor was not clearly erroneous, and (3) that the decision was not contrary to controlling law or policy.  [Id. at 48].

In October of 2010, WCU's Modern Foreign Languages Department Committee on Tenure, Promotion, and Reappointment voted unanimously to recommend Davis for promotion and tenure. [Doc. 38-33 at 2-3]. Further, in his letter dated October 24, 2010, García-Castañón recommended Davis for promotion and tenure. [Id. at 6].  Davis' tenure and promotion application then went to the College Collegial Review Committee for the College of Arts and Sciences. The College Collegial Review Committee recommended Davis for tenure but did not recommend him for promotion, writing on the appropriate WCU form dated November 9, 2010, that "there are various concerns about his scholarship."  [Id. at 4].

Also on November 9, 2010, while teaching a routine class, Davis shared personal medical information with his students but admittedly "told them a lie." [Doc. 33-62 at 47]. He told his class he had been diagnosed with a brain tumor requiring medical treatment in California. [Doc. 33-15 at 1]. In reality, Davis testified that he, at the time, was making poor and impulsive decisions because he had just been diagnosed with HIV. [Doc. 33-62 at 47]. On that same date, two WCU employees met with García-Castañón to tell him they were uncomfortable being around Davis and were concerned for his well-being. [Doc. 33-17 at 1]. The next morning, García-Castañón received a telephone call from a third WCU employee who expressed the same feeling and concern about Davis. [Id.]. On November 11, 2010, García-Castañón met with WCU's ERT personnel for one hour and fifteen minutes to apprise them of the situation. [Doc. 33-17 at 1].

On Monday, November 15, 2010,[5] WCU's ERT personnel met again with Davis. Present were WCU Director of Human Resources Kathy Wong,

---

[5] Neither party places a specific date on the November, 2010, ERT meeting involving Davis. [Doc. 34 at 5; Doc. 38 at 9]. A careful reading of the record, however, discloses that such meeting occurred the week after Dr. García-Castañón met with the ERT personnel [Doc. 38-36 at 14], and on the "Monday" before Davis' trip to California. [Id. at 34]. Since García-Castañón met with the ERT on November 11, 2010, and since Kathy Wong stated during the ERT meeting with Davis that "Santiago [García-Castañón] contacted us last week," and since Davis' travel to California occurred from November 19, 2010, until the end of that month, the meeting must have taken place on November 15, 2010, the "Monday" mentioned by Davis during his meeting with the ERT. [Id.].

WCU Counseling and Psychological Services Director John Ritchie, and WCU Director of Police Ernie Hudson. [Doc. 33-17 at 2]. Wong began the meeting with Davis, shortly before Ritchie and Hudson arrived, explaining that García-Castañón initiated contact with the ERT the previous week. [Doc. 38-36 at 4]. Wong continued by telling Davis that García-Castañón had some concerns about Davis based upon feedback from other faculty members. [Id.]. Davis admitted that he had "had a really rough semester last fall [2009] … And then I was not on top of my game in the least." [Id. at 5]. Davis continued, "I got all better. But during that very trying period of my life I, you know, outside of the university made some decisions that were not the best. And this person, during my tenure and promotion meeting – my record is impeccable here at this school in terms of my scholarship, my teaching and my service, chose to launch a vendetta against me in the middle of that meeting." [Id. at 5-6]. Wong confirmed that García-Castañón's "feedback" from the other WCU employees "swirl[ed] around the faculty evaluation meeting. … And obviously … Jamie has information about what was discussed and voted on and determined in that meeting that I didn't think [he was] supposed to have access to. I was thinking those meetings were confidential." [Id. at 14-15]. Davis responded by saying, "People talk." [Id. at 15]. Wong acknowledged that "people talk" and reiterated that

WCU employees also talked to García-Castañón because they were "worried about your welfare, and perhaps one or more [ ] even worried about their welfare, because of, you know, your emotional levels in the department." [Id. at 16].

At this point in the meeting, Ritchie clarified the purpose of the ERT meeting with Davis. Ritchie began by saying that he, as Director of WCU Counseling and Psychological Services, could have met with Davis alone,

> but I was concerned that that would look like it's a mental health focus, and seeing it's not a mental health focus and yet it's impacting the work environment, so it makes since [sic] that Kathy would be here. But that's – you know, really it's all kind of an early stage stuff of just saying we just want you to know some things are going on and want you to be aware so you have some choices to make so that it doesn't get to the level to where you're going to have a department head or a dean or whatever could be involved saying, "Hey, this has got to stop." So that's the advantage of this.

[Id. at 17]. The ERT personnel conveyed to Davis that his colleagues at WCU felt uncomfortable around him, **not** based on his overdose during the Fall Semester 2009, but due to his recent behavior following the College Collegial Review Committee's recommendation that he be denied promotion. [Id.]. Ritchie reiterated to Davis illustrative phrases from WCU employees, such as:

"I'm feeling like I'm getting dragged into this."

"I'm feeling like there's pressure for me to get involved, and if I say no I feel like I need to not say[ ] anything or hold back."

"There's still the persistent kind of pressure to get involved."

"I'm asked to get involved when I don't want to. It feels like it's sort of frenetic."

[Id. at 20; 29]. Ritchie then explained, "I would think the norm would be that if somebody is getting news that they don't like there's sort of a way to handle that that doesn't sort of start pulling in people and raising some anxiety and kind of making it a more impact kind of thing." [Id. at 21]. Davis referenced his promotion denial and medical diagnosis and responded to the ERT by saying, "if you get two double whammies in one week, you know, you're not going to jump up for joy and you're not going to rejoice." He explained that he "sought counsel with my friends. I reached into my network of support of individuals who are friends. Well, unfortunately, in the university setting there is an overlap between friendship and professionalism." [Id. at 25].

In the end, Davis neither revealed his medical diagnosis [Id. at 38] nor did he point to any other affliction or disability underpinning his "pressuring" behavior he tacitly recognized as having been beyond the pale. While he felt it was "utterly unfair on the part of anybody who has spoken up … not to

trust in my ability to do the right thing to walk away from that initial burst of sadness and upsetness[,]" upon leaving the ERT meeting he stated he was going to reduce his "circle of intimates" and "be very judicious in the future" of the persons with whom he shared private information and feelings. [Id. at 41-42].

On November 16, 2010, the day after Davis met with ERT personnel, Davis began reducing his "circle of intimates" by telling García-Castañón during an office meeting that he would no longer consider García-Castañón to be his friend but "would be civil, smile, and continue doing his job." [Doc. 33-15 at 1]. As a part of this same conversation, Davis told García-Castañón he had to travel to California "for a court appearance." [Id.]. Two days later, Davis notified García-Castañón by email that he would be traveling to California from November 19, 2010, to November 30, 2010, "for medical purposes." [Doc. 33-15 at 2].

On or about December 9, 2010, Dean Ford wrote to Davis informing him that she would not recommend him for tenure and promotion because of his scholarship. [Doc. 38-34 at 2-3]. Later that month, Ford wrote to Davis again, this time to explain to him that he was not then eligible to apply for tenure and promotion and recommended that he withdraw his application and reapply the following year. [Doc. 33-19]. Plaintiff met with Ford and

García-Castañón on January 7, 2011. Dean Ford wrote to Davis after that meeting confirming that Davis would withdraw his current dossier for tenure and promotion. [Doc. 33-20].

In March, 2011, Davis was formally diagnosed with post-traumatic stress disorder, anxiety disorder, panic disorder, and major depressive disorder. [Doc. 38-19 at 28]. Davis admitted, however, he had not been diagnosed with bipolar disorder. [Id. at 42]. Davis informed no one at WCU about these diagnoses at that time nor did he seek any accommodations then.

On August 28, 2011, Davis sent text messages to several WCU faculty members stating he had "lethally overdosed, goodbye." [Doc. 33-23]. Davis testified that his actions were premeditated because, prior to ingesting a number of Xanax pills, he had researched the lethal dosage to take in order to end his life. [Doc. 33-62 at 30]. WCU professor Dr. Christopher Cooper was one such recipient of Davis' text messages. [Id. at 32]. At the time of Davis' text messages, Cooper was at the home of WCU colleague Kathleen Brennan and her husband. [Doc. 38-6 at 10]. Dr. Cooper immediately began

corresponding[6] with Davis but did not recall any of the specifics except that he conveyed, "Don't kill yourself." [Id. at 11].

Dr. Cooper testified that Davis indicated his suicide attempt was due, in part, to some negative feelings Davis believed fellow WCU employees Kathleen Brennan and Vicki Szabo harbored toward him. [Id.]. According to Davis, "I know that I had made mention to Chris Cooper that Vicki Szabo's coldness had contributed to my depression. And I know that I also made a statement about Kathleen Brennan, whom I also loved, but I don't recall what that was." [Doc. 33-62 at 32]. Dr. Szabo wrote an email to her supervisor, Dr. Richard Starnes, then-Head of the History Department, on August 31, 2011, expressing her dual concerns, first for the safety and well-being of Davis, and second, that she found Davis' inclusion of her in his texts puzzling and "professionally disruptive" especially since she had not had any contact with Davis in months. [Doc. 33-22 at 2-3]. Dr. Szabo testified that prior to 2010, as colleagues, she and Davis would become engrossed in lengthy conversations. [Doc. 33-69 at 3]. However, she said did not know in what direction any such conversations would go and sometimes they became

---

[6] Dr. Cooper testified that he thought he communicated with Davis by text messaging versus by speaking to him because there was limited cell phone reception at Brennan's home. [Doc. 38-6 at 11].

inappropriate.[7]  [Id.].  After 2010, Szabo found Davis to be unpredictable and erratic and, she felt, he was capable of hurting someone physically.  [Id. at 2].  She thus chose to avoid Davis.  If Szabo were outside and saw Davis outside the building smoking, for example, she would go to a different door. If she were inside and saw him outside, she would wait to leave the building. She testified, "I did not want to engage in a conversation with him." [Id. at 3].

When Jackson County Sheriff's Deputy Robert Nicholson arrived at Davis' house and made contact with him on the day of his suicide texts, he asked Davis "if he was ok and he stated yes." [Doc. 33-21 at 2].  When Davis made his way to the bathroom, Deputy Nicholson observed Davis who "stumbled as if he had to [sic] much to drink."  [Id.].  Deputy Nicholson then radioed for EMS to dispatch an ambulance.  [Id.].  Davis told Deputy Nicholson he had ingested eight Xanax pills and had drunk three beers throughout the day.  He told the deputy he "was not trying to hurt himself but was trying to sleep."  [Id.].  EMS personnel arrived and examined Davis and then asked him if he "wanted to go get help and Mr. Davis stated 'no'." [Id.].

---

[7] As an example of an inappropriate conversation, WCU faculty member Laura Cruz recalled a lunch outing with Davis and other WCU staff where Davis discussed having sex with a student in his office.  [Doc. 33-77 at 3].  Cruz testified that she was not sure whether she believed Davis or not, but "that's one of a series of incidents that led me to overall question his judgment[.]"  [Id.].

At that point, Davis signed a refusal for treatment form and deputy Nicholson "cleared the call." [Id.].

On August 29, 2011, García-Castañón was informed by Dean Gibbs Knotts[8] that he had heard from various individuals about the Davis texts. [Doc. 33-23]. Dr. Laura Wright, a faculty member from the English Department, received Davis' suicide text and called Davis to check on his condition but did not reach him. Davis called her back the next day and left her a voicemail. Dr. Wright testified, "The voicemail he left scared the crap out of me[.]" [Doc. 33-75 at 4; 7]. After Davis texted his suicide messages, Dr. Wright had to teach a class in the McKee building where Davis maintained his office. According to García-Castañón, "She asked the then head of the department to please accompany her and wait outside of the classroom while she was teaching the class, because she didn't feel comfortable." [Doc. 33-65 at 4]. On August 30, 2011, Dean Knotts and Dr. García-Castañón met with the ERT personnel. [Id.].

On September 1, 2011,[9] the ERT personnel convened another meeting with Davis. [Doc. 38-38]. Present, again, were the same team

---

[8] As of the Fall Semester of 2011, Gibbs Knotts had replaced Wendy Ford as Dean of WCU's College of Arts and Sciences.

[9] Neither party places a specific date on the September, 2011, ERT meeting involving Davis. However, Kathy Wong's email sent to Dean Knotts and Dr. García-Castañón

members as before: WCU Director of Human Resources Kathy Wong, WCU Counseling and Psychological Services Director John Ritchie, and WCU Director of Police Ernie Hudson. Kathy Wong began the meeting by explaining that Dean Knotts had called her saying that Davis had texted a few people some suicidal messages. [Id. at 10]. Davis responded by saying that his doctor had added a new medication called Viibryd to his regimen and that one side-effect of the drug was the potential for suicidal tendencies. Davis further stated that his doctor had since removed him from that medicine. [Id. at 11]. John Ritchie then interjected that the ERT felt the need to meet with Davis again since the main purpose of the last meeting – that Davis establish better personal boundaries with his work colleagues – appeared to have been ignored by Davis sending his suicide texts to multiple faculty members. [Id. at 12-13]. Davis responded saying he had absolutely no recollection of sending any texts "and my doctor has removed me from this medication and everything appears to be okay." [Id. at 14]. Ritchie then asked Davis if his overdose was purposeful and premeditated to which Davis responded that he would not answer Ritchie's question as "I think that's protected under my HIPAA rights[.]" [Id. at 16]. Ritchie, compelled to

---

following the ERT's meeting with Davis indicated that the ERT met with Davis "at 11:00 a.m. on Thursday, September 1, 2011, in HFR 219." [Doc. 38-40].

assume Davis' suicide attempt was sincere, made an initial suggestion to Davis that they put in place a plan where a person Davis trusted, and who was willing to accept the responsibility of being an emergency contact, could fulfill that role for Davis. That way, according to Ritchie, the WCU community could avoid "not having it end up being something that a number – or lots of people are contacted and sort of unsettled, because I know that they weren't – I'm guessing they weren't – they didn't know they were identified as the person you would contact to help you out." [Id. at 19].   Davis followed up by reassuring the ERT:  "And my response to that will be to say that my doctor has it under control now."  [Id.].

Davis then questioned why his personal (not professional) texting activity, that occurred at his home and off campus, on a non-work day (Sunday), without the use of campus telephones or campus email, and involved private messages he sent to other persons' cell phones, required the ERT to convene the present meeting with him.   [Id. at 19-21].  Ritchie again explained that, even though Davis' conduct occurred "outside" the university setting, it was conduct designed and executed by Davis to embroil WCU employees.  He continued, stating "[a]nd I'm just – I'm just wanting to support you in finding a pathway to help that doesn't end up scaring the people you work with.  That's all I want."   [Id. at 26].

During the remainder of the ERT meeting, Davis revealed that he had contracted HIV and (erroneously) that he had bipolar disorder. [Id. 26; 54]. Further, he explained that his doctors were having to manage all of his 19 medications which "is a very hard thing to do, and doctors will make errors." [Id. at 28; 34]. Ritchie then asked Davis if he had a plan in place in the event Davis needed to reach out again in a crisis situation. [Id. at 34]. Davis responded in the affirmative and in such an event, he would call his parents. [Id. at 35]. As the meeting was winding down, Davis gave the ERT permission to "let the concerned parties know that I'm fine. That I'm going to take care of myself. That I am – I am going to – I'm going to make a very clear distinction between the personal and the professional henceforth." [Id. at 40]. Before the meeting concluded, Davis asked Wong for information concerning both short-term and long-term disability. [Id. at 40-44]. Wong explained the application process to him and provided Davis with the WCU contact person should his doctors find that disability was the appropriate option at some future date. [Id.].

On September 2, 2011, on behalf of all three members of the ERT, Wong emailed a memorandum to Dean Knotts and Dr. García-Castañón. [Doc. 38-40]. In the memorandum, the ERT recommended five alternative options the Dean and Department Head could consider as they pertained to

Davis.  [Id.].    Also on September 2, 2011, Dean Knotts and Dr. García-Castañón met with the ERT personnel again, and at one point, were joined by Mary Ann Lochner, the University's General Counsel.  [Doc. 33-23].

On September 7, 2011, Dean Knotts and Dr. García-Castañón met with Davis in person.  [Doc. 38-42].  When Davis was asked why he thought he was being asked to meet with his Dean and Department Head, he candidly responded:

> I'll tell the two of you the same thing that I told them. I am a chemical soup right now, and although we are culturated to try to believe that doctors are perfect … they're fallible.  I got put on a new med, one of the predominant side effects – I'm on two major meds right now to combat the bipolar stuff, and when the second one was added to the mix it went bananas. So that's been controlled.  What I – what I guess I mourn the most is that, you know, Santiago, who's my good friend, and I – coping with bipolar disorder is something that's been very hard to admit and to get into therapy and to start addressing that. I have a little more hope now about it, but at the time I realize that the crossover between the personal and the professional, especially at these moments of crises, that's not anything I want to breed.

[Doc. 38-42 at 6-7].  When Davis was asked by Knotts how they could best support him, Davis responded, "This is not your job to do that.  Your job is in a professional capacity to find out what way you can be most supportive." [Id. at 11].  Davis explained he was seeing a therapist who was helping him establish appropriate interpersonal boundaries. [Id. at 13-14].  His therapist

suggested that Davis ask very direct questions of others to determine the boundaries:

> Like Will Layman [sic], our colleague, is my friend, and I called him the other day to see how he was. We started chatting and he said, "How are you?" And I said, "What do you want to know? Do you want me to tell you this tale?" And he said, "Yes." He said, "I'm your friend, I want to hear it." So the parameters were well established. And I think that in the past perhaps that has not been completed as successfully.

[Id. at 14]. Dean Knotts and Dr. García-Castañón acknowledged that Davis had received counseling and was then in therapy. [Id. at 18]. With Davis' ongoing counseling in mind, and as that pertained to maintaining his safety and his ability to perform his job, they asked Davis if he felt like he was moving in a positive direction. [Id.]. Without answering the question directly, Davis instead asked Dean Knotts if he could provide Davis with "affirmation where possible, and the deconstruction of stigma also where possible." [Id. at 19]. Apparently understanding Davis' questions to be related to his career advancement process, Dean Knotts assured Davis that as his dossier progressed through the tenure and promotion review stages at WCU, he and Dr. García-Castañón would make sure he was not unfairly stigmatized and that any decision reached would be based on the evidence and not based on rumor and innuendo. [Id. at 20]. Following the meeting, Dean Knotts

wrote to Davis on September 12, 2011. [Doc. 38-41]. In his letter, Dean Knotts reiterated that Davis should not be sending unwanted text messages or sharing personal information to anyone not receptive. Knotts further confirmed that Davis' medication had been adjusted properly and that he would be taking steps to maintain appropriate personal boundaries and collegiality with WCU employees. [Id.].

In the fall of 2011, Davis applied for tenure and promotion again. [Doc. 33-28]. The Modern Foreign Languages Department's tenure and promotion committee voted two in favor and one against recommending Davis for promotion and tenure. [Id. at 1]. The committee, however, noted concerns about Davis' scholarship and collegiality. [Id. at 2]. Dr. García-Castañón, as the Department Head, recommended Davis for promotion and tenure. [Id.]. The College Collegial Review Committee for the College of Arts and Sciences tied in its vote: four in favor of and four against, with two abstentions. [Id. at 3]. Despite the tie, the College Collegial Review Committee noted that "[t]he majority of the committee did not support the candidate for tenure." [Id.]. Plaintiff's application then went to Dean Knotts for a recommendation on Davis' promotion and tenure. On December 2, 2011, Dean Knotts recommended against tenure, and wrote on Davis' AA-12 form that Davis had "displayed a pattern of behavior that is disruptive to

the teaching, scholarship, and service missions of the College and University." [Id.]. Davis received his AA-12 form containing the negative recommendation on Monday, December 5, 2011. [Doc. 33-30].

On December 6, 2011, Davis met with Dean Knotts. [Doc. 38-52]. At the beginning of the meeting, Davis asserted that a tenure candidate's trait for "collegiality" had no bearing on the promotion and tenure process which was concerned only with scholarship, service, and teaching. [Id. at 16]. Davis suggested that a faculty member acting in a non-collegial manner should be reported to the Faculty Grievance Committee for discipline, not have "collegiality" weigh as a factor in his career advancement process. [Id. at 17]. Davis did not address, however, the tenure and promotion requirement that applicants submit themselves to two "Collegial Review" committees. Davis next baldly asserted that his denial of promotion and tenure due to his alleged "pattern of behavior that is disruptive" was "an EEOC and ADA violation[.]" [Id. at 24]. Davis claimed the right thing for the university to have done, with regard to his "disruptive behavior," would have been "to set the person up with, you know, the Employee Assistance Program to get the, you know … to provide resources for them." [Id. at 31]. When Knotts asked Davis if he ever requested such assistance, Davis avoided answering the question and asserted instead it was solely the university's responsibility: "I

think its's a – it's a supervisory recommendation." [Id. at 32]. During this meeting, Davis notified Knotts he did not want to resort to litigation nor did he want to engage the media in a manner that would negatively affect WCU. Davis made it clear, however, "I'm not going to be abused by the system." [Id. at 23; 59-60]. Ultimately, Davis requested that Knotts reconsider his decision regarding Davis' tenure and promotion. [Id. at 79]. Knotts told Davis, "let me sleep on it[.]" [Id. at 87]. The record is silent as to whether Knotts ever reconsidered his decision.

During this timeframe, Davis showed WCU faculty member Rebecca Lasher a letter from the College Collegial Review Committee that recommended denying him tenure and promotion. [Doc. 33-61]. Davis asked Lasher how she thought people on that committee voted. Davis told Lasher he believed that members of the committee who were not in favor of him were "betrayers." [Id.]. Lasher was uncomfortable and contacted her Department Head and Dean Knotts with safety concerns. [Id. at 2]. Dean Knotts, in turn, relayed this information to Kathy Wong, Dr. García-Castañón, Interim Associate Provost Dr. Mark Lord, and University Counsel Mary Ann Lochner by email dated December 8, 2011. [Doc. 33-30]. Dr. Lord, while serving as WCU's Interim Associate Provost for two years from 2011 to 2013, received several complaints or concerns regarding Davis' conduct. [Doc. 33-

59]. A number of faculty members were made uncomfortable by Davis' conduct and some were afraid of him. [Id.]. Some faculty members did not want to be in their offices in the McKee Building when Davis was in the building. Some faculty members would check the parking lot for Davis' car before deciding whether to leave their offices in the McKee Building. [Id.].

Subsequent to Dean Knotts' negative tenure and promotion recommendation for Davis, the University Collegial Review Committee reviewed Davis' dossier. On February 1, 2012, that Committee voted three in favor of and eleven against a recommendation of tenure for Davis, and voted one in favor of and thirteen against a recommendation of promotion for Davis. [Doc. 33-28 at 4; Doc. 38-53 at 2]. By letter dated February 3, 2012, Interim Provost Dr. Beth Lofquist accepted the Committee's recommendation as her own and forwarded the same on to the Chancellor. [Doc. 38-53 at 2]. Lofquist notified Davis that "the committee was concerned about your pattern of disruptive behavior." [Id.].

After Lofquist sent her recommendation to the Chancellor, Davis asked Lofquist to reconsider her decision per the procedures outlined in the Faculty Handbook. [Doc. 38-59]. Lofquist then met with Davis on February 24, 2012 [Id.; Doc. 38-60]. Also on February 24, 2012, Chancellor David O. Belcher notified Davis by letter that he would recommend to the University Board of

Governors that Davis be denied tenure and promotion. [Doc. 38-54 at 2]. Chancellor Belcher's letter explained to Davis the right to appeal his decision to the Faculty Hearing Committee. [Id.].

Lofquist, as a part of the reconsideration process requested by Davis, spoke with two members of the ERT (Kathy Wong and Ernie Hudson), and also spoke with Dean Knotts and Department Head García-Castañón. [Doc. 38-15 at 19 to 22]. After asking Lofquist to reconsider her decision, Davis contacted a colleague, Dr. Erin McNelis, who, like Davis, maintained an office in the McKee building. [Doc. 33-73 at 2]. Davis asked McNelis if she would write a letter of reference on his behalf for him to submit to Lofquist. [Id.]. McNelis testified that she responded to Davis by email explaining that she would write such a letter "and mentioned that I would be honest and that it was not all completely good[.]" [Id. at 2-3]. McNelis explained that her correspondence with Davis was typically late at night and by email because she and Davis both worked late in their offices. [Id. at 3]. McNelis stated that while Davis never approached her physically, she felt physically fearful of him not knowing if he was nearby in the building or if she would run into him at 2:00 a.m. [Id.]. She explained that her fear was based on several factors: Davis was displeased with the "not all completely good" reference letter he sought from her, he was "a man of size," he was a former police

officer who had access to firearms, he had expressed extreme anger in the past (for instance, toward individuals who were biased or bigoted in some way with respect to sexual orientation), and he knew she worked late in the McKee building. [Id. at 3-4]. McNelis testified that due to her fear of Davis, she suffered from anxiety, lost sleep, and could not work. [Id. at 6]. And, according to McNelis, "I was unable to hide the worry from others, so it was fairly significant." [Id.].

On March 12, 2012, Lofquist notified Davis that she had completed the reconsideration of her recommendation to the Chancellor and would not alter her original recommendation to deny Davis tenure and promotion. [Doc. 38-60 at 2]. Like Belcher, Lofquist notified Davis of his right to appeal, which he invoked. [Id.].

After Davis received Lofquist's letter, he spoke with WCU faculty member Dr. Heather Talley, a professor in the Anthropology and Sociology Department. [Doc. 33-38]. Davis made comments to her regarding his denial of tenure and promotion such as, "the enemies will pay" and "I have a plan" and "there will be consequences for those who deny me tenure." [Id.]. Based on these comments and her knowledge that Davis was an avid gun collector, Talley was fearful to come to work on campus. [Id.]. As an additional basis for her fear of Davis, Talley stated Davis wrote a poem in the spring of 2011

entitled "Counter Rape" wherein he described raping former Dean Wendy Ford. [Id.]. Dr. Lori Oxford, Davis' departmental colleague, recalled Davis' poem about Dean Ford as well, describing the poem as a "metaphorical rape." [Doc. 33-64 at 7; 10]. Dr. Oxford also recalled that Davis' poem played a role in Talley seeking an arrangement with WCU to teach on-line classes so she could avoid coming to campus and interacting with Davis due to her fear of him. [Id. at 8].

Dr. Oxford also testified that Davis' poem was not the only material Davis wrote that involved the fictional abuse of a WCU faculty member. She stated that Davis had written a story about Dr. Szabo. [Id. at 10]. Dr. Oxford explained that one of her colleagues was at Davis' house when Davis read from his story. [Id. at 10-11]. The colleague about whom Dr. Oxford spoke was Will Lehman, who attended a party at Davis' home. [Doc. 33-78 at 2]. According to Lehman, "I remember not even five minutes after being there, I started sort of chattering with people sitting next to me. And he said, 'Hold on, hold on, everybody, hold on. This is the part – this is the part where I kill Vicki Szabo.'" [Id. at 2-3]. Lehman testified that while he did not personally feel endangered by Davis, "I was very glad that I wasn't Vicki Szabo at that moment." [Id. at 3].

WCU faculty member Dr. Laura Wright was one of Davis' longtime friends. [Doc. 33-69 at 8]. Due to the length of their friendship, Wright testified she felt persistent pressure from Davis, describing it as

> I feel like there was this sort of constant need to manipulate me and draw me into whatever drama he had going on, whatever boyfriend he was with, whatever intrigue, whatever lie he was telling. And I just didn't want it. And I feel like I tried to negotiate the space of our friendship by remaining friends with him, but also trying really hard to put distance between us.
>
> And I also felt like a lot of my colleagues felt very uneasy and disrupted by him as well, and they would come and talk to me because they knew that we were friends. And they would come speak to me out of concern or fear or just frustration. And that became really disruptive as well to have to sort of negotiate taking care of other people's feelings around Jamie.

[Doc. 33-75 at 2]. Wright stated Davis' disruptive behavior existed during Davis' entire stint at WCU. "[I]t felt pretty constant. I don't – you know, I don't really think of Jamie as sort of ebbing or peaking with regard to drama. It's just always." [Id. at 3]. Personally for her, Wright lost sleep, engaged a therapist, and considered leaving WCU because of Davis' behavior. [Id. at 4]. One of Wright's colleagues who enlisted her help was Heather Talley. Dr. Talley told Wright that Davis was confrontational with her in ways that made her uncomfortable. Wright responded saying, "I told her that I did not think he was a physical threat to her." [Id. at 4]. Wright said Talley remained

unconvinced and ultimately "quit her job because of feeling afraid of him." [Id.].

During the Spring Semester of 2012, Davis was the Chair of the Committee on Nominations, Elections, and Committees (CONEC), which is responsible for conducting all elections of the general faculty at WCU. [Doc. 38-13 at 3; Doc. 33-69 at 15].  Dr. McNelis served as the Chair of the Faculty at that time.  [Doc. 33-69 at 14; 15]. McNelis testified that about this time, Davis, who communicated predominantly by email, "got pushier with some things[.]"  [Doc. 33-73 at 10].  On March 13, 2012, as the Chairs of their respective committees, Davis and McNelis exchanged emails that McNelis asserted constituted a "power struggle" on the part of Davis. [Doc. 33-33]. On March 20, 2012, McNelis emailed Davis requesting that he leave her alone, which Davis then forwarded to other faculty members.  [Doc. 33-73 at 21; 22].  McNelis stated her "students and colleagues noted a change in my demeanor that I did not choose to discuss."  [Doc. 33-73 at 10].   Dr. Szabo, however, was one faculty member who had the opportunity to observe McNelis' demeanor during this time.  [Doc. 33-69 at 14].  Dr. Szabo testified that she encountered McNelis who was standing outside a building on WCU's campus prior to attending a CONEC meeting.  According to Szabo:

> Erin was chair of the faculty. I saw Erin. She was distraught. I went over, asked what was going on.

And said she was terrified that she would go home and he [Davis] would be at her house. She was somewhat incoherent. I'd never – she was – I'd never seen her like that. I'd never seen her like that. And it was – it was upsetting to see someone that upset.

I assured her she would be fine. I told her, you know, nothing is going to happen to you. You know, pull together. We can help you through this, et cetera, et cetera. Went off to our meeting. And she pulled it together for the meeting.

\* \* \* \* \* \* \*

I don't recall doing a follow-up conversation with Erin. And I can't recall the time between that event and when I took over CONEC. I think I took over CONEC in March or April, but I'm not sure. When I say took over her role in CONEC. …Took over her role in CONEC as proxy for the chair.

[Id. at 14-15].

The Faculty Hearing Committee conducted a hearing as a part of Davis' appeal of his tenure and promotion denial on March 26, 2012. [Doc. 38-61]. Davis asserted at this hearing that his denial of tenure and promotion "was based upon discrimination, personal malice and impermissible criteria." [Doc. 38-62 at 2]. The Faculty Hearing Committee found in favor of Davis and concluded that Davis' contentions of personal malice and impermissible criteria had been established. [Id.]. On May 10, 2012, the Chancellor, however, overruled the decision of the Faculty Hearing Committee. [Doc. 38-63 at 2-4].

Sometime after the Chancellor's decision to overrule the Faculty Hearing Committee, Davis sent two cryptic text messages to Dr. Oxford. [Doc. 33-64 at 9]. She forwarded them on to Dr. Wright not knowing what they meant but thinking they could be a threat. [Id.]. Dr. Wright forwarded them on to Dean Knotts. [Doc. 33-39]. The first message said: "Purgatory hath no fury like a smart and creative gay man scorned. The timing is perfect. Hint: citrus Cometh." The second stated, "And here come not my next 15 minutes of fame but actual celebrity and a place in the history books as a brilliant activist who had one touching and smart and creative Idea :)." [Id.]. Davis testified that he sent these texts only to Dr. Oxford and that they were not meant as threats. [Doc. 33-62 at 42]. Davis stated he sent them because he was preparing "to go public with my story at Western Carolina University." [Id.].

Davis appealed the Chancellor's decision to the University Board of Governors. While Davis' appeal was pending, WCU extended to Davis a terminal employment appointment for the 2012-2013 academic year with Davis' last day of employment at WCU being June 30, 2013. [Doc. 33-32]. Pursuant to the provisions of the Faculty Handbook, WCU faculty members who do not receive tenure and promotion are offered a terminal one-year appointment. [Doc. 33-42]. On May 11, 2012, Lofquist notified Davis by

letter that WCU, during the summer break, would develop a workplace plan for him and would communicate that plan to him by the following August before classes resume. [Doc. 33-43]. Interim Dean Dr. Richard Starnes drafted the workplace plan for Davis and communicated it to him in a letter dated July 20, 2012. [Doc. 33-44]. On July 30, 2012, Davis filed an EEOC charge of discrimination. [Doc. 33-45]. Thereafter, but at some point prior to August 24, 2012, Davis wrote to Matt Brown, Senior Human Resources Consultant in WCU's Department of Human Resources, formally requesting in writing accommodations for three disabilities. [Doc. 33-46]. On October 17, 2012, Davis wrote a letter to García-Castañón, which showed a copy to Matt Brown, requesting that he be able to work from home and participate on any WCU committees by email as accommodations. [Doc. 33-48]. Dr. García-Castañón granted these accommodations by letter sent to Davis on October 30, 2012. [Doc. 33-49]. These accommodations were effective through the Fall Semester 2012. [Id.].

On November 8, 2012, Burley B. Mitchell, Jr., as Chair of the Personnel and Tenure Subcommittee for the Board of Governors, and John C. Fennebresque, as Chair of the Committee on Personnel and Tenure for the Board of Governors, submitted to the Board of Governors a "Report of the Committee on Personnel and Tenure" recommending that the Chancellor's

decision denying Davis tenure and promotion be affirmed. [Doc. 38-64]. The Board of Governors received the Report the following day and approved the recommendation contained therein. [Doc. 33-50 at 1; 13].

By letter sent to Davis on January 14, 2013, Dr. García-Castañón extended Davis' accommodations through the end of the Spring Semester 2013. [Doc. 33-51]. On June 10, 2013, Davis applied for short-term disability. [Doc. 33-52]. Davis' short-term disability request was granted, effective May 31, 2013. [Doc. 33-53]. WCU's contract for employment with Davis ended June 30, 2013. [Id.].

## STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the case." N&O Pub. Co. v. RDU Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010). A "genuine dispute" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be genuinely disputed must support its assertion with citations to the record. Fed. R. Civ. P. 56(c)(1). "Regardless of whether he may ultimately be responsible for proof and

persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003). If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue exists. Id.

The parties have submitted cross-motions for summary judgment under Federal Rule of Civil Procedure 56, wherein each side contends that there are no factual issues for trial as to Plaintiff's first and second causes of action and that judgment may be rendered as a matter of law on these claims based upon the record. When the parties each move for summary judgment on the same claim, the Court "must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks and citation omitted). In considering each of the motions for summary judgment, the Court must view the pleadings and materials presented in the light most favorable to the non-movant and must draw all reasonable inferences in the non-movant's favor as well. Adams v. UNC Wilmington, 640 F.3d 550, 556 (4th Cir. 2011).

Upon review of the record before the Court, the Court concludes that the facts are adequately presented therein, and that no genuine dispute as

to any material fact exists.  Accordingly, summary judgment is an appropriate means by which to resolve the issues presented by the parties.

## DISCUSSION

The Amended Complaint asserts five causes of action under the amended ADA and the Rehabilitation Act.  Davis contends Defendants violated the ADA and the Rehabilitation Act by: (1) denying him tenure and promotion; (2) terminating his employment; (3) failing to accommodate his disability; (4) segregating him; and (5) retaliating against him.  [Doc. 10 at 13-15].

**A.    Denial of Tenure and Promotion/Termination Claims**

In his first two claims, Davis contends that he was wrongfully denied tenure and promotion and that his employment was wrongfully terminated. Section 4.09 of the Faculty Handbook provides that when an individual with more than two years of continuous service is not reappointed (e.g., denied tenure and promotion), that individual will receive a "terminal appointment" for one academic year.  [Doc. 38-13 at 38].  Because the Defendants' denial of tenure and promotion effectively resulted in the termination of Davis' employment, these claims seek relief based upon the same conduct of the Defendants.  Accordingly, the Court will address these claims together.

To establish a claim for disability discrimination under the ADA, a plaintiff must prove: (1) that he has a disability; (2) that he is a "qualified individual" for the position in question, and (3) that he was discharged or incurred some other adverse employment action because of his disability. Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 572 (4th Cir. 2015); Halpern v. Wake Forest University Health Sciences, 669 F.3d 454, 461-62 (4th Cir. 2012).  Disability discrimination may be proven through direct and indirect evidence or through the McDonnell Douglas burden-shifting framework.[10]  Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005).

Here, despite the Plaintiff's arguments to the contrary [Doc. 38 at 19-23], the undisputed forecast of evidence does not present any direct evidence of discrimination based upon the Plaintiff's disability.  The Court therefore will analyze the Plaintiff's claims using the McDonnell Douglas framework.  Under this framework, a plaintiff initially must establish a *prima facie* case of discrimination. The burden of production then shifts to the defendant to show a legitimate, nondiscriminatory reason for the employment action. The plaintiff then must show that this proffered reason was merely a pretext for unlawful discrimination.  McDonnell Douglas, 411

---

[10] McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

U.S. at 802-04. At all times, the burden of proof remains with the plaintiff. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981).

A plaintiff establishes a *prima facie* case of wrongful discharge under the ADA by demonstrating that: "(1) he is within the ADA's protected class; (2) he was discharged; (3) at the time of his discharge, he was performing the job at a level that met his employer's legitimate expectations; and (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." Haulbrook v. Michelin N. Am., 252 F.3d 696, 702 (4th Cir. 2001). While the parties do not dispute that the Plaintiff fell within the ADA's protected class or that he was discharged, the Plaintiff has failed to present a forecast of evidence to establish that at the time of his denial of tenure and promotion, he was performing the job at a level that met his employer's legitimate expectations or that his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination.

First, Davis has failed to demonstrate that he was meeting his employer's legitimate expectations at the time that his tenure and promotion were denied. According to the Faculty Handbook, the decision to grant tenure to any applicant at WCU must include, but is not limited to, an assessment of three criteria. [Doc. 38-13 at 28]. First, the faculty member is assessed on his/her demonstrated professional competence as evaluated

by meeting or exceeding departmental criteria. As it pertained to Davis, the Modern Foreign Languages Department's Collegiate Review Document ("CRD") provided for the evaluation of his professional competence based upon the examination of his teaching, scholarship, and service. [Doc. 38-12]. Second, the faculty member is assessed on his/her potential for future contributions. [Doc. 38-13 at 28]. Third, the institutional needs and resources of the university are considered. [Id.]. Aside from these three mandatory considerations, a "decision not to reappoint a faculty member may be made for any reason that is not an impermissible reason." [Id. at 26]. The only impermissible reasons for non-reappointment are: "(a) the exercise by the faculty member of rights guaranteed by the First Amendment to the United States Constitution, or by Article I of the North Carolina Constitution, or (b) the faculty member's race, color, sex, religion, creed, national origin, age, disability, veteran's status, or other forms of discrimination prohibited under polices adopted by the Board of Trustees, or (c) personal malice." [Id. at 27].

As the Fourth Circuit has observed, "we review professorial employment decisions with great trepidation. We must be ever vigilant in observing that we do not sit as a 'super personnel council' to review tenure decisions, always cognizant of the fact that professorial appointments necessarily involve 'subjective and scholarly judgments,' with which we have

been reluctant to interfere[.]" <u>Jiminez v. Mary Washington College</u>, 57 F.3d 369, 376 (4th Cir. 1995) (internal citations omitted). <u>See also</u> <u>Class v. Towson University</u>, 806 F.3d 236, 246 (4th Cir. 2015) (a measure of deference is due to a university's professional judgment in the context of student qualifications); <u>Halpern</u>, 669 F.3d at 463 (same); <u>Davis v. Univ. of N.C.</u>, 263 F.3d 95, 102 (4th Cir. 2001) (same). A grant of tenure is a significant decision for a university, reached only after an exacting and thorough screening process of the applicant. A host of personal components must be considered in the tenure review process. As noted by the Eight Circuit,

> [T]he level of achievement required for tenure will vary between universities and between departments within universities. Determination of the required level in a particular case is not a task for which judicial tribunals seem aptly suited. Finally, statements of peer judgments as to departmental needs, ***collegial relationships*** and individual merit may not be disregarded absent evidence that they are a facade for discrimination.

<u>Brousard-Norcross v. Augustana College Ass'n</u>, 935 F.2d 974, 976 n.3 (8th Cir. 1991) (emphasis added). Adopting an appropriately deferential view, the Court concludes that collegiality is an essential requirement for tenure and promotion at WCU and that Davis could not satisfy this requirement.

While at WCU and now before the Court, Davis' position has concentrated only upon the first criterion of the Faculty Handbook, professional competence. Davis argues that he has not simply satisfied but exceeded the professional competence criterion for tenure and promotion. For this reason, according to Davis, Defendants' denial of his advancement at WCU must necessarily have been discriminatory, in violation of law. In focusing exclusively on the "professional competence" element, however, Davis' argument ignores the Faculty Handbook's remaining two mandatory criterion considerations. Davis provides no forecast of evidence that would tend to prove his potential for future contributions or that his continued presence on the faculty would provide future contributions which would coincide with the institutional needs and resources of WCU. More importantly, however, Davis rejects outright the Defendants' valid consideration of an applicant's trait for "collegiality" as an essential and non-prohibited reason for which the Defendants could deny him tenure and promotion. The record is replete with examples of Davis' admitted behavior that was the antithesis of collegiality. Far from the marked, amicable camaraderie shared among colleagues, Davis' behavior disrupted his fellow faculty members, some of whom were targets of Davis' efforts. Given the undisputed evidence of his lack of collegiality, Davis has failed to present a

forecast of evidence to show that he was satisfying the legitimate expectations of his employer at the time that he was denied tenure and promotion.

Further, Davis has failed to demonstrate that his discharge occurred under circumstances that raise a reasonable inference of unlawful disability discrimination. In this regard, Davis argues that the Defendants denied him tenure and promotion because of his two suicide attempts, and therefore, he was subjected to termination "because [of] the ***symptoms*** of his disabilities ...." [Doc. 38 at 21 (emphasis added)]. Davis' argument fails for two reasons.

First, Davis' own evidence establishes that neither his overdose in his campus office, nor his overdose at his home, were genuine suicide attempts related to a mental health disability. Davis himself characterized each event as the product of a medical error: each the result of the unfortunate side-effects of incompatible medications prescribed by his doctors. Additionally, Dr. Oxford, who observed Davis in his office after the first episode, considered Davis to be exaggerating. Deputy Nicholson, who observed Davis in his home after the second episode, described Davis' movements as being consistent with that of an intoxicated person. Indeed, Davis acknowledged that he had been consuming alcohol that day.

Second, Davis' argument presumes that an employer is prohibited from taking any adverse action against a disabled employee who engages in misconduct related to that disability. This is certainly not the law. In response to Davis' partial summary judgment motion, Defendants cited to Jones v. American Postal Workers Union, 192 F.3d 417, 429 (4th Cir. 1999) and Martinson v. Kinney Shoe Corp., 104 F.3d 683, 686 n.3 (4th Cir. 1997), for the proposition that the ADA is not violated when an employer discharges an employee based upon that employee's misconduct, even if the misconduct is related to a disability. [Doc. 40 at 9]. In his reply Davis has presented no contrary authority, and the Court has located none.

Further, Davis' argument seeks to narrow the record artificially to his two over-dose incidents while ignoring the remainder of his behavior during his employment at WCU. Such factual cherry-picking is impermissible on summary judgment when the Court must consider the entire forecast of undisputed facts. Considering the entire record, the Court concludes that the Plaintiff has failed to show a reasonable inference of discrimination in his discharge.

Even if the Plaintiff's forecast of evidence were sufficient to establish a reasonable inference of discrimination, the Defendants have presented a forecast of a legitimate, non-discriminatory reason for the denial of tenure

and promotion: namely, his disruptive behavior and lack of collegiality. The burden of production thus shifts to the Plaintiff to create a genuine issue of fact that such reason is pretextual. The Plaintiff has failed to do so here. Davis has not come forward with any evidence that tends to show that Defendants' tenure and promotion denial was pretextual.[11] Because a lack of collegiality is a permissible reason for non-reappointment under the Faculty Handbook, and because Davis has failed to carry his burden as described herein, the Court concludes that Davis' ADA claims based on the denial of tenure and promotion and his termination must be dismissed.

## B.    Failure to Make Reasonable Accommodation

An employer discriminates against a qualified individual with a disability when the employer does "not make[ ] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the employer. 42 U.S.C. § 12112(b)(5)(A).

---

[11] Davis makes much of the fact that the Faculty Hearing Committee determined WCU used impermissible criteria in denying Davis tenure and promotion but was overruled by the Chancellor. [Doc. 38 at 17]. The Court agrees with the Seventh Circuit which, in analogous circumstances, concluded that where a tenure applicant is ultimately denied tenure even though a contrary recommendation may have been made at some earlier time in the review process, the court will not "second-guess" the multiple groups and multiple individuals who determined the applicant did not deserve tenure. Sun v. Board of Trustees of Univ. of IL., 473 F.3d 799, 815 (7th Cir. 2007).

Here, Davis argues "Defendants failed to engage in the interactive process to determine whether a work accommodation was necessary for Davis. Other than telling him after his suicide attempts to stop being so disruptive, Defendants never explored a workplace accommodation with Davis." [Doc. 41 at 21].

Davis' argument that "Defendants failed to engage in the interactive process" fails for two reasons. First, Davis never requested any accommodation.[12] After Davis accused Dean Knotts of committing an EEOC and ADA violation by his tenure denial decision, Knotts directly asked Davis whether he ever requested any accommodation. Davis avoided answering the question and asserted instead it was the university's responsibility. Davis' position that he bore no responsibility in the accommodation process, however, is erroneous. "The appropriate reasonable accommodation is best

_____

[12] Davis asserts that his request to Dean Knotts that Knotts bring about "the deconstruction of stigma" following his disclosure of his "bipolar stuff" was an unconventional request for an accommodation. "Plaintiff recognizes this is not your standard fare accommodation request. It is, however, a request aimed at reducing the alleged fear and hostility towards him as a result of his disability related behavior." [Doc. 41 at 21 n.7]. "The term *reasonable accommodation* means … [m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position[.]" 29 C.F.R. § 1630.2(o)(1)(ii). As such, a reasonable accommodation is a solution tailored to the precise circumstances inherent in the employee's disability and is necessarily case-specific. Davis' request to "deconstruct a stigma" cannot amount to an accommodation request because the focus of this request would be on altering the perceptions and behavior of others in response to an employee's disability, not ameliorating the workplace obstacles that directly interfere with the disabled employee's ability to perform.

determined through a flexible, interactive process that involves both the employer and the individual with a disability." 29 C.F.R. 1630, App., *Process for Determining the Appropriate Reasonable Accommodation*. In short, the reasonable accommodation process requires the active participation of the employee. In this matter, Davis thwarted the Defendants' efforts to engage in any type of accommodation process by initially refusing even to disclose any disability. The record is uncontested that Davis never requested a reasonable accommodation during his tenure and promotion application processes.[13]

Second, when Davis made his disabilities known to the Defendants, Davis indicated no accommodations were required. In fact, he told the ERT he had everything under control. According to Kathy Wong, "And [the first] time that we met him, he said that he was fine[.]" [Doc. 38-21 at 8]. At the second ERT meeting, Davis admitted that he had had a really rough semester in the fall of 2009 and was not on the top of his game. Davis continued, "I got all better." [Doc. 38-36 at 4-5]. Davis, at the third ERT meeting, reassured the team: "And my response to that will be to say that my doctor has it under control now." [Doc. 38-38 at 19]. Established circuit

---

[13] Davis did make a formal request for accommodation by letter dated October 17, 2012, after his tenure and promotion application had been denied. [Doc. 33-48]. That claim for reasonable accommodation is addressed in Part II.B., infra.

precedent is clear on an employee's accommodation responsibilities: an employer is not obligated to accommodate an employee's disability until the employee provides a proper diagnosis and requests a specific accommodation. Halpern, 669 F.3d at 465 (citation omitted). At *every* ERT meeting, Davis assured the team he would either take care of himself or had engaged doctors and therapists for help. Davis cannot now claim that the Defendants never accommodated any disability when at the time he frustrated the Defendants' efforts to determine whether anything could be done to assist him.

Following the denial of tenure and promotion, Interim Dean Dr. Richard Starnes drafted a workplace plan for Davis to follow during his terminal year at WCU and communicated it to him in a letter dated July 20, 2012. [Doc. 33-44]. On October 17, 2012, Davis wrote to his Department Head, García-Castañón, requesting two specific accommodations to Dean Starnes' plan: (1) to be permitted to work entirely from home, and (2) to be permitted to communicate with other members of the CONEC committee solely by email. [Doc. 33-48]. On October 30, 2012, García-Castañón granted Davis' requests for accommodations. [Doc. 33-49]. Further, by letter dated January 14, 2013, García-Castañón extended these accommodations for Davis through his final semester at WCU. [Doc. 33-51].

From the foregoing facts of record, there exists no genuine dispute that the Defendants made accommodations for Davis' disabilities as he specifically requested. Accordingly, the Defendants are entitled to a judgment as a matter of law on Davis' failure to accommodate claim.

## C. Segregation Claim

The ADA prohibits a covered entity from "limiting, segregating, or classifying a[n] … employee in a way that adversely affects the opportunities or status of such … employee because of the disability of such ... employee." 42 U.S.C. § 12112(b)(1). The ADA further provides, in pertinent part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such an entity." 42 U.S.C. § 12132.

Davis claims the Defendants unlawfully segregated him when they implemented Interim Dean Starnes' workplace plan for Davis. [Doc. 10 at 14]. As a part of Starnes' workplace plan, Davis' office was relocated from the McKee building to the Forsyth building, both of which house faculty offices and classrooms. Davis was allowed to work only in the Forsyth building, Hunter Library, and the University Center on campus. Further, Davis was required to notify García-Castañón if he intended to attend

departmental meetings, or enter the McKee, Stillwell, or Coulter buildings. [Doc. 33-44]. By Davis' own admission, however, Starnes' workplace plan was never implemented as originally conceived. While Davis testified that he was given keys to his new office in the Forsyth building, he never went. [Doc. 33-62 at 44]. Before Starnes' workplace plan was to become operational in the Fall Semester of 2012, Davis sought and received accommodations that would permit him to work from home. Consequently, Davis was never segregated. Accordingly, the Court concludes that Defendants are entitled to judgment as a matter of law on Davis' segregation claim.

## D.    Retaliation Claim

To establish a *prima facie* case of retaliation, a plaintiff must show that: (1) he engaged in a protected activity; (2) his employer acted adversely toward him; and (3) his protected activity was causally connected to his employer's adverse action. Rhoads v. FDIC, 257 F.3d 373, 392 (4th Cir. 2001). Here, Davis has failed to present a forecast of evidence to show that the denial of tenure and promotion and his ultimate discharge were causally connected to any of his claimed protected activity. Accordingly, the Court concludes that the Defendants are entitled to a judgment as a matter of law on Davis' retaliation claim.

**E.     Plaintiff's Rehabilitation Act Claims**.

The Plaintiff also asserts claims for wrongful termination and discrimination under the Rehabilitation Act.  In order for the Plaintiff to prevail under this Act, the Plaintiff's discrimination claims must be tied to "any program or activity receiving Federal financial assistance" to confer subject matter jurisdiction on this Court.  29 U.S.C. § 794(a); Rivera-Flores v. Puerto Rico Telephone Co., 64 F.3d 742 (1st Cir. 1995).  The Plaintiff failed to plead such facts in his Complaint and has failed to present any forecast of evidence that the Defendants, or any program or activity under their control, received federal funding. The Plaintiff therefore has failed to establish that this Court may exercise jurisdiction over his Rehabilitation Act claims.  See Class, 806 F.3d at 253 n.1 (under the Rehabilitation Act, the plaintiff must establish that the defendant received federal funds).

Even if the Court's jurisdiction to entertain these claims had been established, however, the Plaintiff has conceded that the standards applicable to his Rehabilitation Act claims are the same standards that are applicable to his ADA claims.  [Doc. 38 at 18 n.8].  See Halpern v. Wake Forest Univ. Health Sciences, 669 F.3d 454, 461 (4th Cir. 2012) ("To the extent possible, we construe the ADA and Rehabilitation Act to impose similar requirements.").  Accordingly, for the reasons set forth above granting

summary judgment in favor of the Defendants on the Plaintiff's ADA claims, the Court concludes that the Defendants are entitled to a judgment as a matter of law on the Plaintiff's Rehabilitation Act claims as well.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Defendants' Motion for Summary Judgment [Doc. 33] is hereby **GRANTED**; the Plaintiff's Motion for Partial Summary Judgment [Doc. 35] is hereby **DENIED**; and this case is dismissed.

**IT IS FURTHER ORDERED** that all pending motions in *limine* [Docs. 46, 47, 48, 49, 50, 52] are hereby **DENIED AS MOOT**.

**IT IS SO ORDERED.**       Signed: February 19, 2016

Martin Reidinger
United States District Judge